IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re:                                           ) | |
|                                                  ) | Case No.: 15-09539 |
| Yellow Cab Affiliation, Inc.            ) | |
|                                                  ) | Ch. 7 (converted) |
| Debtor.                            ) | |
|                                                  ) | Hon. Carol Doyle |
| _____ ) | |
|                                                  ) | |
| MICHAEL K. DESMOND, not individually,  ) | |
| but as Chapter 7 Trustee for the Bankruptcy  ) | |
| Estate of YELLOW CAB AFFILIATION, INC.,  ) | |
|                                                  ) | |
|              Plaintiff,                    ) | Adv. No. _____ |
|       v.                                       ) | |
|                                                  ) | |
| TAXI AFFILIATION SERVICES, LLC,        ) | |
|                                                  ) | |
|              Defendant.                 ) | |

**ADVERSARY COMPLAINT FOR TURNOVER OF PROPERTY,
AN ACCOUNTING AND OTHER RELIEF**

Michael K. Desmond, not individually but solely in his capacity as Chapter 7 Trustee

("Trustee") of the bankruptcy estate of Yellow Cab Affiliation, Inc. ("Debtor"), by and through

his attorneys, hereby complains against Taxi Affiliation Services, Inc. ("TAS") as follows:

**PARTIES**

1.      Michael K. Desmond is the duly appointed Chapter 7 Trustee for the Debtor's

bankruptcy estate.

2.      TAS is a Delaware limited liability company whose principal place of business is

also located at 3351 W. Addison St. Chicago, IL 60618.

3.      At all relevant times, the Debtor and TAS were wholly owned subsidiaries of

Yellow Group LLC.

4.      Yellow Group LLC is owned by People Mover, Inc. (55.0%) and Yellow Cab Partners LLC (45.0%).  Patton Corrigan ("Corrigan") owns 100% of Yellow Cab Partners LLC. Michael Levine ("Levine") owns 85% of People Mover, Inc.  Corrigan and Levine served as officers of the Debtor.  Levine also served as the Manager of TAS.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§157 and 1334, and the Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

6.      This adversary proceeding is a core proceeding within the meaning of, *inter alia*, 28 U.S.C. §§ 157(b)(2)(A), (E), and (O).

7.      Venue of the Bankruptcy Case and of this adversary proceeding is proper in this Judicial District pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTS COMMON TO ALL COUNTS

8.      On March 18, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code"), in the United States  Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court"), thereby commencing the above-entitled case and creating the Debtor's estate (the "Estate").

9.      The Debtor owned and managed a taxicab affiliation company in the greater Chicago area consisting of approximately 1600 members.  The Debtor's offices were located at 3351 W. Addison St. Chicago, IL 60618.

10.      The Debtor conducted virtually no business of its own.  Rather, the Debtor provided services to its affiliation members entirely through the operations of TAS pursuant to

the terms of a pre-petition Services Agreement.  According to the Examiner's Report in this case, the operations and financial affairs of the Debtor and TAS were inextricably intertwined.[1]

11.       The Debtor and TAS were managed by the same officers, controlled by the same individuals, shared the same office space and used the same employees.

## SERVICES AGREEMENT

12.       Prior to and during the Chapter 11 case, TAS provided support services to Debtor including but not limited to: collection of membership dues; cashiering services; dispatch; accounting; back-office functions; maintenance of books and records; IT support and services; assistance in purchasing and supplying radio and communication equipment to Yellow Cab Affiliation Members; assistance securing advertising programs; and assistance with securing insurance.  These services were provided pursuant to a Service Agreement attached hereto as **Exhibit A**.

13.       In reality, TAS controlled virtually every aspect of the Debtor's operations.  Prior to the Petition Date, TAS collected and held all of the Debtor's receipts for membership dues, transferring funds to the Debtor on an as needed basis.

14.       After the bankruptcy filing, TAS began depositing receipts for membership dues into the Debtor in Possession Bank Account at The Private Bank Trust ("DIP Account"). Thereafter, TAS would sporadically sweep payments out of the DIP Account for compensation for its services as cash was available.

15.       According to the Services Agreement, TAS was entitled to compensation for its services as follows:

(i)       a base fee of $2,500 per month for services provided hereunder.

---

[1] On October 1, 2015, the Bankruptcy Court entered an order appointing Daniel Dooley as an Examiner in the Chapter 11 case. [*Dkt. No.* 437].  On December 7, 2015, Mr. Dooley filed his report with the Court  ("Examiners Report").  [*Dkt. No.* 572].

(ii)     for each month that the Association has in excess of twenty (20) affiliate members, then with respect to each such affiliate member in excess of twenty (20), an additional fee of $45 per affiliate member per week (based on the average number of affiliate members in the Association for each respective month), *subject to reconciliation and adjustment within ninety (90) days after the end of each year to reimburse* Service provider for the expenses described in Section 2(b).

16.     Section 2( b) of the Services Agreement provides:

(b)     The Association agrees to pay and reimburse the Service Provider (or its designee) actual and direct out-of-pocket expenses (including fees and disbursements of attorneys, accountants and other professionals retained by the Service Provider in connection with services provided hereunder) incurred by the Service Provider and its personnel in performing services hereunder to the Association and its subsidiaries.  In addition, the Service Provider shall be reimbursed by the Association for all direct costs it incurs on behalf of the Association for any selling, general and administrative costs (including accounting, bookkeeping, executive management, travel, telephone, data processing, and other overhead expenses) reasonably allocated by the Service Provider to services provided or  performed on behalf of the Association.  *Any such reimbursement shall be payable by the Association promptly on the Service Provider's rendering of a statement therefor, together with such supporting data as the Association reasonably shall require.*

(Exhibit A at ¶2).

17.     In April 2015, TAS contends that the Services Agreement was materially modified  retroactive to January 1, 2014, to waive the collection and recognition of the base fee and additional fee, and to expand the scope of the expenses for which the Debtor would reimburse TAS.

18.     Contrary to the integration provision in paragraph 5(b) of the Services Agreement, this alleged modification was oral and was never reduced to writing nor was it signed on behalf of the Debtor or TAS.

## POST-PETITION PAYMENTS TO TAS

19.     Notwithstanding, the Debtor made the following monthly payments to TAS

throughout the Chapter 11 proceeding:

| *Month* | *TAS Service Payment* |
| --- | --- |
| April 2015 | $117,303.00 |
| May 2015 | $448,121.00 |
| June 2015 | $578,221.00 |
| July 2015 | $289,110.00 |
| August 2015 | $101,189.00 |
| September 2015 | $522,948.00 |
| October 2015 | $306,082.00 |
| November 2015 | $333,454.00 |
| December 2015 | $465,506.00 |
| January 2016 | $453,454.00 |
| February 2016 | $230,650.00 |
| March 2016 | $420,000.00 |
| April 2016 | $406,605.00 |
| May 2016 | $250,000.00 |
| June 2016 | $342,454.00 |
| July 2016 | $283,052.00 |
| August 2016 | $310,752.00 |
| September 2016 | $371,748.00 |
| October 2016 | $425,000.00 |
| November 2016 | $318,608.00 |

| Total | $6,974,257.00 |
|-------|---------------|

20.     Contrary to the express terms of the Services Agreement, no statement or invoice was delivered to the Debtor in exchange for any of these payments, nor did TAS provide any supporting data in connection with any of the payments it received.

21.     In addition to the above, documents provided by TAS in August of 2016 disclose for the first time that TAS charged the Debtor $289,156.00 for post-petition "referral fees" to Taxi Medallion Management ("TMM"), a related company also indirectly owned and controlled by Corrigan and Levine.  These "referral fees" were purportedly based on an alleged oral agreement and were never approved by the Bankruptcy Court.

22.     TAS also appears to have charged the Debtor approximately $31,000.00 for reimbursement of costs TAS incurred in connection with the bankruptcy case without Court approval or notice to creditors.

23.     According to the sworn deposition testimony of Gary Sakata ("Sakata"), who simultaneously served as the Secretary/Treasurer of the Debtor and the Chief Financial Officer of TAS, TAS was charging the Debtor a weekly fee of approximately $79,812.00 for its services.

24.     The Debtor's Summary of Cash Receipts and Disbursements for the month ended September 30, 2016, identifies total outstanding accounts payable as $82,772.00.  [*Dkt. No.* 1077].  Mr. Sakata testified at the Meeting of Creditors pursuant to Section 341 of the Bankruptcy Code, that this balance reflected all amount due to TAS under the Services Agreement as of that date.

25.     According to the Debtor's Summary of Cash Receipts and Disbursements for the month ending October 31, 2016, TAS paid itself $425,000.00 in service fees from the DIP Account. [*Dkt. No.* 1078].

26.     According to the Debtor's Summary of Cash Receipts and Disbursements for the sixteen (16) day period ending November 16, 2016, TAS paid itself an additional $318,608.00 in service fees from the DIP Account.  [*Dkt. No*. 1079].

## MEMBERSHIP SECURITY DEPOSITS

27.     Effective on November 16, 2016, (the "Conversion Date") the Debtor's bankruptcy case was converted to a case under Chapter 7 of the Bankruptcy Code. [*Dkt. No*. 1048].

28.     The Trustee was appointed as the Chapter 7 trustee of the Estate on the Conversion Date.

29.     As of the Conversion Date, the taxi cab affiliation consisted of more than 1,364 member contracts.  Each of the affiliation members entered into a Taxicab Affiliation Agreement ("Affiliation Agreement"), which required affiliation members to pay dues to the Debtor on a weekly basis of approximately $195.00 per week.  In addition, the members were required to post a refundable security deposit with the Debtor.  Members could also request that the Debtor provide radio and dispatch equipment for which the members assumed responsibility.  A sample membership contract is attached hereto as **Exhibit B.**

30.     According to Schedule B filed by the Debtor [*Dkt. No*. 213], the Debtor had collected membership deposits totaling $755,264.23 as of the Petition Date ("Security Deposits").  According to the Debtor's schedules, those Security Deposits were in the possession of TAS as of the Petition Date.

31.     According to the Debtor's records, TAS was still holding Security Deposits in the amount of $591,923.84 as of the Conversion Date.  A listing of the Security Deposits in TAS's possession as of the Conversion Date is attached hereto as **Exhibit C.**

7

32.     On November 18, 2016, the Trustee made a demand upon TAS to turnover all Security Deposits to the Estate pursuant to 11 U.S.C §542(a).

33.     On November 22, 2016, TAS refused to turnover the Security Deposits to the Trustee.

## POST-CONVERSION CASH RECEIPTS

34.     On November 16, 2016 and November 17, 2016, after conversion of this case to Chapter 7, TAS collected receipts for membership dues which belong to the Estate.  TAS has failed and refused to turnover those receipts to the Estate.

35.      According to the Final Debtor In Possession Report filed by the Debtor on January 15, 2017 [*Dkt No.* 1080] ("Final DIP Report"), TAS is holding $68,575.00 in funds which it collected after the Conversion Date which belong to the Estate ("Post-Conversion Cash Receipts").

36.     On November 18, 2016, the Trustee made a demand upon TAS to turnover all Post-Conversion Cash Receipts to the Estate pursuant to 11 U.S.C §542(a), and account for all funds received.

37.     On November 22, 2016, TAS refused to turnover all Post-Conversion Cash Receipts to the Trustee.

### COUNT I
**Turnover and Accounting of Property of the Estate
Security Deposits
11 U.S.C. § 542(a)**

38.     The Trustee repeats and re-alleges each and every allegation in Paragraphs 1 through 37 of this Adversary Complaint as if fully set forth herein.

39.     Section 542(a) of the Bankruptcy Code states:

8

Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. §542(a).

40.     According to Schedule B filed by the Debtor [*Dkt. No*. 213], the Debtor had collected Security Deposits totaling $755,264.23 prior to the Petition Date.

41.     According to the Debtor's records, TAS was still holding Security Deposits in the amount of $591,923.84 as of the Conversion Date. See attached **Exhibit C**.

42.     The Security Deposits paid to Debtor are property of the Estate pursuant to Section 541(a) of the Bankruptcy Code.

43.     The Security Deposits are property of the Estate which the Trustee may use under the meaning of Section 542(a) of the Bankruptcy Code.

44.     The Security Deposits are not of inconsequential value or benefit to the Estate.

45.     TAS is in possession, custody, and control of the Security Deposits.

46.     On November 18, 2016, the Trustee made a demand upon TAS to turnover all Security Deposits to the Estate pursuant to 11 U.S.C §542(a).   See attached **Exhibit F**.

47.     On November 22, 2016, TAS refused to turnover the Security Deposits to the Trustee.  See attached **Exhibit G**.

48.     TAS has no legal or contractual basis for refusing to return the Security Deposits to the Estate.

49.     Pursuant to Section 542(a) of the Bankruptcy Code, Defendant is obligated to deliver to the Trustee, and account for, the Security Deposits.

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor of the Trustee:

    a.   Ordering TAS to turnover Security Deposits in the amount of at least $591,923.84 for the benefit of the Estate;

    b.   Ordering TAS to account to the Trustee for all Security Deposits received or refunded since the Petition Date;

    c.   Granting such other relief as this Court deems just and proper.

### COUNT II
**Turnover and Accounting of Property of the Estate –
Post-Conversion Cash Receipts
11 U.S.C. § 542(a)**

50.    The Trustee repeats and re-alleges each and every allegation in Paragraphs 1 through 49 of this Adversary Complaint as if fully state herein.

51.    Section 542(a) of the Bankruptcy Code states:

Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. §542(a).

52.    TAS collected and is currently holding $68,575.00 in Post-Conversion Cash Receipts. [*Dkt No.* 1080].

53.    The Post-Conversion Cash Receipts constitute property of the Estate pursuant to Section 541(a) of the Bankruptcy Code.

54. On November 18, 2016, the Trustee made a demand upon TAS to turnover all Post-Conversion Cash Receipts to the Estate pursuant to 11 U.S.C §542(a), and account for all funds received.

55. On November 22, 2016, TAS refused to turnover all Post-Conversion Cash Receipts to the Trustee.

56. The Post-Conversion Cash Receipts are not of inconsequential value or benefit to the Estate.

57. Defendant has no legal or contractual basis that permits it to hold or setoff against the Post-Conversion Cash Receipts.

58. Pursuant to Section 542(a) of the Bankruptcy Code, Defendant is obligated to deliver to the Trustee, and account for, the Post-Conversion Cash Receipts.

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor of the Trustee:

    a. Ordering TAS Defendant to turnover all Post-Conversion Cash Receipts to the Trustee in the minimum amount of $68,575.00;

    b. Ordering TAS to account to the Trustee for all Post-Conversion Cash Receipts;

    c. Granting such other relief as this Court deems just and proper.

## COUNT III
### Turnover and Accounting of Property of the Estate –
### Overpayment of Service Fees to TAS

59. The Trustee repeats and re-alleges each and every allegation in Paragraphs 1 through 58 of this Adversary Complaint as if fully state herein.

11

60.     On or about January 1, 2010, the Debtor entered into a Services Agreement with

TAS, a copy of which is attached hereto as **<u>Exhibit A</u>**.

61.     Pursuant to the terms of the Services Agreement, TAS provided support services

to Debtor including but not limited to: collection of membership dues; cashiering services;

dispatch; accounting; back-office functions; maintenance of books and records; IT support and

services; assistance in purchasing and supplying radio and communication equipment to Yellow

Cab Affiliation Members; assistance securing advertising programs; and assistance with securing

insurance.

62.     According to the Services Agreement, TAS was entitled to compensation for its

services as follows:

(iii)   a base fee of $2,500 per month for services provided hereunder.

(iv)    for each month that the Association has in excess of twenty (20) affiliate
members, then with respect to each such affiliate member in excess of twenty
(20), an additional fee of $45 per affiliate member per week (based on the average
number of affiliate members in the Association for each respective month),
***subject to reconciliation and adjustment within ninety (90) days after the end of
each year to reimburse*** Service provider for the expenses described in Section
2(b).

63.     Section 2(b) of the Services Agreement provides:

(b)     The Association agrees to pay and reimburse the Service Provider (or its
designee) actual and direct out-of-pocket expenses (including fees and
disbursements of attorneys, accountants and other professionals retained by the
Service Provider in connection with services provided hereunder) incurred by the
Service Provider and its personnel in performing services hereunder to the
Association and its subsidiaries.  In addition, the Service Provider shall be
reimbursed by the Association for all direct costs it incurs on behalf of the
Association for any selling, general and administrative costs (including
accounting, bookkeeping, executive management, travel, telephone, data
processing, and other overhead expenses) reasonably allocated by the Service
Provider to services provided or performed on behalf of the Association.  ***Any
such reimbursement shall be payable by the Association promptly on the***

*Service Provider's rendering of a statement therefor, together with such supporting data as the Association reasonably shall require.*

(Exhibit A at ¶2)(emphasis added).

64.      In April 2015, TAS contends that the Services Agreement was materially modified  retroactive to January 1, 2014, to waive the collection and recognition of the base fee and additional fee, and to expand the scope of the expenses for which the Debtor would reimburse TAS.

65.      Contrary to the integration provision in paragraph 5(b) of the Services Agreement, this alleged modification was never reduced to writing nor was it signed on behalf of the Debtor or TAS.

66.      According to the sworn deposition testimony of Gary Sakata, who simultaneously served as the Secretary/Treasurer of the Debtor and the Chief Financial Officer of TAS, TAS was charging the Debtor a weekly fee of approximately $79,812.00 for its services.

67.      Contrary to the express terms of the Services Agreement, no statement or invoice was delivered to the Debtor in exchange for any of these payments, nor did TAS provide any supporting data in connection with any of these payments.

68.      Instead, TAS would sporadically sweep payments out of the DIP Account as cash was available.  This was done without notice to the Court or other parties in interest.

69.      In addition to the above, documents provided by TAS in August of 2016 disclose for the first time that TAS charged the Debtor $289,156.00 for post-petition "referral fees" to Taxi Medallion Management ("TMM"), a related company also indirectly owned and controlled by Corrigan and Levine.   These "referral fees" were purportedly based on an alleged oral agreement and were never approved by the Bankruptcy Court.

13

70.     TAS also appears to have charged the Debtor approximately $31,000.00 for reimbursement of costs TAS incurred in connection with the bankruptcy case without Court approval or notice to creditors.

71.     The Debtor's Summary of Cash Receipts and Disbursements for the month ended September 30, 2016, identifies total outstanding accounts payable as $82,772.00.  [*Dkt No.* 1077].  This Summary of Cash Receipts and Disbursements is attached hereto as **Exhibit D**.  Mr. Sakata testified at the Meeting of Creditors pursuant to Section 341 of the Bankruptcy Code that this balance reflected all amounts due to TAS under the Services Agreement as of that date.

72.     According to the Debtor's Summary of Cash Receipts and Disbursements for the month ended October 31, 2016, TAS paid itself $425,000.00 in service fees from the DIP Account. [*Dkt No.* 1078].

73.     According to the Debtor's Summary of Cash Receipts and Disbursements for the sixteen (16) day period ended November 16, 2016, TAS paid itself an additional $318,608.00 in service fees from the DIP Account.  [*Dkt No.* 1079].

Based on the information provided by the Debtor, TAS has been overpaid for its service fees for the months of October 2016 and November 2016 calculated as follows:

| | |
|---|---|
| Accounts Payable as of September 30, 2016 | $82,772.00 |
| TAS Service Fees October 2016 and November 2016 | $558,684.00 [2] |
| TAS Payments October 2016 | ($425,000.00) |
| TAS Service Fees thru November 16, 2016 | ($318,608.00) |
| Overpayment | $102,152.00 |

---

[2] Calculated based on a weekly fee of  $79,812.00 for the seven (7) week period between October 1, 2016 and November 16, 2016.

74.     TAS overpaid itself for its service fees of at least $102,152.00 for the months of

October 2016 and November 2016.

75.     In addition, the payment of referral fees to TAS in the amount of $289,156.00 and

reimbursement of bankruptcy costs in the amount of $31,000.00 were never approved by the

Bankruptcy Court.

76.     Based on the above, TAS has been overpaid for its alleged post-petition services

by at least $422,308.00.

77.     These overpayments to TAS constitute property of the Estate.

78.     The overpayment to TAS is not of inconsequential value or benefit to the Estate.

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor

of the Trustee and against TAS:

      a.   Ordering TAS to turnover to the Trustee the overpayments of service fees in

         the amount of $422,308.00; and

      b.   Granting such other relief as this Court deems just and proper.

<u>**COUNT IV**</u>
**Claim For Accounting**
**Service Fees Paid To TAS During Chapter 11 Proceeding**

79.     The Trustee repeats and re-alleges each and every allegation in Paragraphs 1

through 78 of this Adversary Complaint as if fully state herein.

80.     TAS was an insider that controlled virtually every aspect of the Debtor's

operations.

81.     Throughout the course of the Chapter 11 proceeding, TAS paid itself a total of

$6,974,257.00 in service fees from the DIP Account.

82.     In order to pay itself, TAS sporadically swept payments out of the DIP Account as cash was available.  This was done without notice to the Court or other parties in interest.

83.     TAS also appears to have unilaterally expanded the scope of costs and expenses for which it sought to be compensated for under the Services Agreement.  The Debtor's records indicate that TAS was allocating all of its operating expenses among the Debtor and the other affiliations being managed by TAS.

84.     In addition to the above, TAS was charging the Debtor for "referral fees" to TMM and for reimbursement of bankruptcy expenses incurred by TAS.

85.     While TAS swept all available cash out of the DIP Account, there is no indication that TAS made any provision for other Debts being incurred by the Debtor, including but not limited to trade debt, professional fees or the fees and costs being incurred by the Official Committee of Unsecured Creditors, nor was the Debtor left with any operating profit.

86.     Contrary to the express terms of the Services Agreement, no statement or invoice was delivered to the Debtor in exchange for any of these payments, nor did TAS provide any supporting data in connection with any of these payments when they were made.

87.     As of the Conversion date, the Debtor was left with little or no cash in the estate, and unpaid Chapter 11 administrative claims in excess of $1,500,000.00.  As a result the Estate was administratively insolvent.

88.     Based on the above, the Trustee seeks an accounting of all fees paid to TAS for the duration of Debtor's Chapter 11 bankruptcy to determine: (1) if TAS has been paid service fees in excess of what it was entitled and (2) if any excess funds paid to TAS constitute property of the Estate.

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor of the Trustee:

a. Order Defendant to provide an accounting of all payments received by Defendant during the pendency of Debtor's Chapter 11 bankruptcy;

b. Grant Such other Relief as the Bankruptcy Court deems just and proper.

## COUNT V
### Disgorgement of Payments
### 11 U.S.C. §726(b)

89.      The Trustee repeats and re-alleges each and every allegation in Paragraphs 1 through 88 of this Adversary Complaint as if fully set forth herein.

90.      Section 726(b) of the Bankruptcy Code provides:

(b)      Payment on claims of a kind specified in paragraph (1), (2), (3), (4), (5), (6), (7), (8), (9), or (10) of section 507(a) of this title, or in paragraph (2), (3), (4), or (5) of subsection (a) of this section, shall be made pro rata among claims of the kind specified in each such particular paragraph, except that in a case that has been converted to this chapter under section 1112, 1208, or 1307 of this title, a claim allowed under section 503(b) of this title incurred under this chapter after such conversation has priority over a claim allowed under section 503(b) of this title incurred under any other chapter of this title or under this chapter before such conversion and over any expenses of a custodian superseded under section 543 of this title.

11 U.S.C. §726(b).

91.      In the event there is insufficient money in the Estate to pay every claim in full, Section 726(b) requires creditors of the same priority class be paid pro-rata.

92.      To the extent Chapter 11 administrative expenses are paid on an interim basis and it is ultimately determined that there will be insufficient funds to similarly pay all other Chapter 11 administrative claims, those who have received interim payments are required to disgorge funds so that all other administrative claims share pro rata.

93.     Throughout the course of the Chapter 11 proceeding, TAS paid itself a total of $6,974,257.00 in service fees from the DIP Account.

94.     In order to pay itself, TAS sporadically swept payments out of the DIP Account as cash was available.  This was done without notice to the Court or other parties in interest.

95.      While TAS  sporadically swept all available cash out of the DIP Account, there is no indication that TAS made any provision for other Debts being incurred by this Debtor, including but not limited to trade debt, professional fees or the fees and costs being incurred by the Official Committee of Unsecured Creditors, nor was the Debtor left with any operating profits.

96.     Contrary to the express terms of the Services Agreement, no statement or invoice was delivered to the Debtor in exchange for any of these payments, nor did TAS provide any supporting data in connection with any of these payments when they were made.

97.     During the course of the Chapter 11 case, TAS had complete control over the cash flow of the Debtor, assuring itself of the payment of its own service fees, to the detriment of other administrative creditors.

98.     As of the Conversion date, the Debtor was left with little or no cash in the Estate, and unpaid Chapter 11 administrative claims in excess of $1,500,000.00.

99.     As a result the Debtor's Chapter 11 estate is administratively insolvent.

100.    TAS was an insider that controlled virtually every aspect of the Debtor's operations.

101.     The payments made to TAS during the Chapter 11 case in the amount of $6,974,257.00 were not made in the ordinary course of business or pursuant to ordinary business terms.

18

102.    Based on the above, the service fees paid to TAS during the Chapter 11

proceeding are subject to disgorgement pursuant to 11 U.S.C. §726(b).

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor

of the Trustee and against TAS:

a.   Ordering TAS to disgorge payments received from the Debtor  in the amount

of at least $1,500,000.00, or such other amount sufficient to assure pro rata

distribution to other Chapter 11 administrative claimants as required by 11

U.S.C. §726(b); and

b.   Such other relief as the Bankruptcy Court deems just and proper.

### COUNT VI
### (Alternative Count)
### Avoidance of Post-Petition Payments
### 11 U.S.C. §549(a)(2)(B)

103.    The Trustee repeats and re-alleges each and every allegation in Paragraphs 1

through 102 of this Adversary Complaint as if fully set forth herein.

104.    Section §549(a) of the Bankruptcy Code allows a Trustee to avoid post-petition

payments and  provides as follows:

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a
transfer of property of the estate (1) that occurs after the commencement of the case
and…(B) that is not authorized under this title or by the court.

11 U.S.C. §549(a)(2)(B).

105.    Section 363(c)(1) of the Bankruptcy Code states, "[i]f the business of the debtor is

authorized to be operated….and unless the court orders otherwise the [debtor in possession] may

enter into transactions…in the ordinary course of business…without notice or a hearing."  11

U.S.C. §363(c)(1).

106.     Transactions which do not occur in the ordinary course of business can only be paid after notice and a hearing and with approval of the Bankruptcy Court.

107.     Throughout the course of the Chapter 11 proceeding, TAS paid itself a total of $6,974,257.00 in service fees from the DIP Account.  A summary of all payments made to TAS during the pendency of Debtor's Chapter 11 bankruptcy is attached hereto as **Exhibit E**, ("Transfers").

108.     During the course of the Chapter 11 case, TAS had complete control over the cash flow of the Debtor, assuring itself of the payment of its own service fees, to the detriment of other administrative creditors.

109.     In order to pay itself, TAS sporadically swept payments out of the DIP Account as cash was available.

110.     While TAS sporadically swept all available cash out of the DIP Account, there is no indication that TAS made any provision for other Debts being incurred by this Debtor, including but not limited to trade debt, professional fees or the fees and costs being incurred by the Official Committee of Unsecured Creditors, nor was the Debtor left with any operating profits.

111.     Contrary to the express terms of the Services Agreement, no statement or invoice was delivered to the Debtor in exchange for any of these Transfers, nor did TAS provide any supporting data in connection with any of these Transfers when they were made.

112.     TAS had complete control over the Debtor's operations as well as the cash flow of the Debtor.

113.     TAS was an insider as defined by the bankruptcy code.

114.    The post-petition Transfers to TAS in the amount of $6,974,257.00 did not take place in the ordinary course of business, or pursuant to ordinary business terms, and therefore notice and a hearing would have been required in order for each of these Transfers to have been allowed under 11 U.S.C. §503(b).

115.    The payments to TAS were made to insiders without notice to the Court or other parties in interest, and were not authorized.

116.    Based on the above, each of the Transfers identified in Exhibit E should be avoided pursuant to 11 U.S.C. §549(a)(2)(B) of the Bankruptcy Code.

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor of the Trustee:

a.    Determining all Transfers made to TAS took place outside of the ordinary course of business; and

b.    Entering judgment in favor of the Trustee and against TAS in the amount of $6,974,257.00; and

c.    Granting such other relief as this Court deems just and proper.

**COUNT VII**
**(Alternative Count)**
**Recovery of Post-Petition Transfer**
**11 U.S.C. §550(a)**

117.    The Trustee repeats and re-alleges each and every allegation in paragraphs 1 through 116 of this Adversary Complaint as if fully set forth herein.

118.    The Defendant was the initial transferee of the Transfers and/or the entity for whose benefit the Transfers were made.

21

119. The Trustee is entitled to recover the value of the Transfers, plus applicable interest, pursuant to 11 U.S.C. §550(a)(1).

WHEREFORE, the Trustee requests the Bankruptcy Court enters judgment in favor of the Trustee:

a. Determining the Trustee is able to recover all Transfers under 11 U.S.C. §550(a);

b. Authorizing the Trustee to recover the full value of all Transfers from Defendant pursuant to 11 U.S.C. §550(a);

c. Award the Trustee costs and reasonable attorneys' fees to the extent permitted by law, through trial and any subsequent appeals;

d. Award the Trustee post-judgment interest pursuant to 28 U.S.C. §1961 until the entire amount of all Transfers are paid; and

e. Such relief as the Bankruptcy Court deems just and proper.

## COUNT VIII
### Equitable Subordination
### 11 U.S.C. §510(C)

120. The Trustee repeats and re-alleges each and every allegation in Paragraphs 1through 119 of this Adversary Complaint as if fully set forth herein.

121. Section 510(C) of the Bankruptcy Code states, "…after notice and a hearing, the court may under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."

122. A debtor corporation's officers, directors and persons in control of the debtor are "insiders" of the debtor as defined in 11 U.S.C. §101(31).

123.    The Debtor and TAS were managed by the same officers, controlled by the same individuals, shared the same office space, and used the same employees.

124.    TAS had complete control over the Debtor's operations as well as the cash flow of the Debtor.

125.    TAS was an insider as defined by the bankruptcy code.

126.    The Debtor was a mere instrumentality of TAS and other creditors have been prejudiced by the transactions between TAS and the Debtor.

127.    The payments made by the Debtor to TAS failed to comport with the duties of a Debtor in Possession under the Bankruptcy Code and were detrimental to the Estate.

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor of the Trustee:

      a.    Determining that should TAS be allowed any administrative claim for services performed for the Debtor, such claims should be equitably subordinated to the claims of other creditors in this case pursuant to 11 U.S.C. §510(c); and

      b.    Such other relief as the Bankruptcy Court deems just and proper.

Dated:  March 27, 2017

                        Respectfully Submitted,

                        **MICHAEL K. DESMOND, not individually but as Chapter 7 Trustee of the bankruptcy estate of YELLOW CAB AFFILIATION, INC.**

                        By:_____*/s/ Michael K. Desmond*_____
                              One of his Attorneys

Michael K. Desmond (IL #6208809)
Lindsey L. Purdy (IA #AT0011959)
FIGLIULO & SILVERMAN, P.C.
10 S. LaSalle Street, Suite 3600
Chicago, Illinois 60603
Tel: (312) 251-4600
Fax: (312) 251-4610