## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: Yellow Cab Affiliation, Inc., <br><br> Debtor. | Case No. 15-9539 <br><br> Ch. 7 (converted) <br><br> Hon. Carol Doyle |
| Michael K. Desmond, as Chapter 7 Trustee for the Bankruptcy Estate of Yellow Cab Affiliation, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Taxi Affiliation Services, LLC, <br><br> Defendant. | Adv. No. 17-133 |

### DEFENDANT TAXI AFFILIATION SERVICES, LLC'S ANSWER

Taxi Affiliation Services, Inc. ("TAS") responds to the Complaint filed by Michael K. Desmond, in his capacity as Trustee for Debtor Yellow Cab Affiliation, Inc., as follows:

### PARTIES

1.      Michael K. Desmond is the duly appointed Chapter 7 Trustee for the Debtor's bankruptcy estate.

**Answer:** Admitted.

2.      TAS is a Delaware limited liability company whose principal place of business is also located at 3351 W. Addison St. Chicago, IL 60618.

**Answer:** Admitted.

3.       At all relevant times, the Debtor and TAS were wholly owned subsidiaries of Yellow Group LLC.

**Answer**:  Admitted that since 2005 the Debtor has been a wholly-owned subsidiary of Yellow Group LLC.  Admitted that since 2006 TAS has been a wholly-owned subsidiary of Yellow Group LLC.  Denied to the extent it is alleged that either the Debtor or TAS were wholly-owned subsidiaries of Yellow Group LLC at other times.

4.       Yellow Group LLC is owned by People Mover, Inc. (55.0%) and Yellow Cab Partners LLC (45.0%).  Patton Corrigan ("Corrigan") owns 100% of Yellow Cab Partners LLC. Michael Levine ("Levine") owns 85% of People Mover, Inc.  Corrigan and Levine served as officers of the Debtor.  Levine also served as the Manager of TAS.

**Answer:**  Admitted that Yellow Group LLC is owned by People Mover, Inc. and Yellow Cab Partners, LLC.  Admitted that Patton Corrigan owns 100% of Yellow Cab Partners LLC. Denied that Michael Levine owns 85% of People Mover, Inc.  Admitted that Coorigan and Levine served as officers of the Debtor.  Admitted that Corrigan and Levine served as Managers of TAS.

## JURISDICTION AND VENUE

5.       The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§157 and 1334, and the Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

**Answer**:  Admitted.

6.       This adversary proceeding is a core proceeding within the meaning of, *inter alia*, 28 U.S.C. §§ 157(b)(2)(A), (E), and (O).

**Answer:**  Admitted.

7.      Venue of the Bankruptcy Case and of this adversary proceeding is proper in this Judicial District pursuant to 28 U.S.C. §§ 1408 and 1409.

**Answer:** Admitted.

### FACTS COMMON TO ALL COUNTS

8.      On March 18, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court"), thereby commencing the above-entitled case and creating the Debtor's estate (the "Estate").

**Answer**: Admitted.

9.      The Debtor owned and managed a taxicab affiliation company in the greater Chicago area consisting of approximately 1600 members.  The Debtor's offices were located at 3351 W. Addison St. Chicago, IL 60618.

**Answer**: Admitted that the Debtor owned and managed a taxicab affiliation company in the greater Chicago area, which at one time consisted of approximately 1600 members. Admitted that the Debtor's offices were at one time located at 3351 W. Addison St. Chicago, IL 60618.  Denied that membership has always remained at 1600.

10.      The Debtor conducted virtually no business of its own. Rather, the Debtor provided services to its affiliation members entirely through the operations of TAS pursuant to the terms of a pre-petition Services Agreement.  According to the Examiner's Report in this case, the operations and financial affairs of the Debtor and TAS were inextricably intertwined.[1]

**Answer**: Admitted that the Examiner found that "accounting processes and records" of

---

[1] On October 1, 2015, the Bankruptcy Court entered an order appointing Daniel Dooley as an Examiner in the Chapter 11 case.  [*Dkt. No*. 437].  On December 7, 2015, Mr. Dooley filed his report with the Court  ("Examiners Report").  [*Dkt. No*. 572].

the Debtor and TAS are intertwined.  TAS denies the remaining allegations in paragraph 10.

11.     The Debtor and TAS were managed by the same officers, controlled by the same individuals, shared the same office space and used the same employees.

**Answer:**  Admitted that the Debtor and TAS had some overlapping officers and shared the same office space.  Denied that the Debtor and TAS shared all of the same officers or employees or that the Debtor and TAS were controlled by the same individuals.

**SERVICES AGREEMENT**

12.     Prior to and during the Chapter 11 case, TAS provided support services to Debtor including but not limited to: collection of membership dues; cashiering services; dispatch; accounting; back-office functions; maintenance of books and records; IT support and services; assistance in purchasing and supplying radio and communication equipment to Yellow Cab Affiliation Members; assistance securing advertising programs; and assistance with securing insurance.   These services were provided pursuant to a Service Agreement attached hereto as **Exhibit A**.

**Answer:**  Denied that TAS provided any dispatch service other than overflow dispatch service.  Otherwise admitted.

13.     In reality, TAS controlled virtually every aspect of the Debtor's operations. Prior to the Petition Date, TAS collected and held all of the Debtor's receipts for membership dues, transferring funds to the Debtor on an as needed basis.

**Answer:**   Admitted that pre-petition TAS collected and held Debtor's receipts for membership dues and paid the Debtor's expenses with those funds.  TAS denies the remaining allegations in paragraph 13.

14.     After the bankruptcy filing, TAS began depositing receipts for membership dues into the Debtor in Possession Bank Account at The Private Bank Trust ("DIP Account").

Thereafter, TAS would sporadically sweep payments out of the DIP Account for compensation for its services as cash was available.

**Answer:**  Admitted that post-petition TAS deposited receipts for membership dues into the DIP Account.  Admitted that the Debtor paid TAS for TAS's services from the DIP Account and that from time-to-time the DIP Account lacked sufficient funds for TAS to collect payments for its services in a timely fashion.  TAS denies the remaining allegations in Paragraph 14.

15.    According to the Services Agreement, TAS was entitled to compensation for its services as follows:

(i)    a base fee of $2,500 per month for services provided hereunder.

(ii)    for each month that the Association has in excess of twenty (20) affiliate members, then with respect to each such affiliate member in excess of twenty (20), an additional fee of $45 per affiliate member per week (based on the average number of affiliate members in the Association for each respective month), ***subject to reconciliation and adjustment within ninety (90) days after the end of each year to reimburse*** Service provider for the expenses described in Section 2(b).

**Answer:**  Admitted.

16.    Section 2(b) of the Services Agreement provides:

(b)    The Association agrees to pay and reimburse the Service Provider (or its designee) actual and direct out-of-pocket expenses (including fees and disbursements of attorneys, accountants and other professionals retained by the Service Provider in connection with services provided hereunder) incurred by the Service Provider and its personnel in performing services hereunder to the Association and its subsidiaries.  In addition, the Service Provider shall be reimbursed by the Association for all direct costs it incurs on behalf of the Association  for  any  selling, general  and  administrative  costs  (including accounting, bookkeeping, executive  management, travel, telephone, data processing, and other overhead expenses) reasonably allocated by the Service Provider to services provided or  performed on behalf of the Association.  Any such reimbursement shall be payable by the Association promptly on the Service Provider's rendering of a statement therefor, together with such supporting data as the Association reasonably shall require.

(Exhibit A at ¶2).

**Answer:** Admitted.

17.      In April 2015, TAS contends that the Services Agreement was materially modified retroactive to January 1, 2014, to waive the collection and recognition of the base fee and additional fee, and to expand the scope of the expenses for which the Debtor would reimburse TAS.

**Answer:** Admitted.

18.      Contrary to the integration provision in paragraph 5(b) of the Services Agreement, this alleged modification was oral and was never reduced to writing nor was it signed on behalf of the Debtor or TAS.

**Answer:** Admitted that a formal, written amendment was not created and signed by the Debtor and TAS.  Denied insofar as various written documents describe the modification.

### POST-PETITION PAYMENTS TO TAS

19.      Notwithstanding, the Debtor made the following monthly payments to TAS throughout the Chapter 11 proceeding:

| *Month* | *TAS Service Payment* |
| --- | --- |
| April 2015 | $117,303.00 |
| May 2015 | $448,121.00 |
| June 2015 | $578,221.00 |
| July 2015 | $289,110.00 |
| August 2015 | $101,189.00 |
| September 2015 | $522,948.00 |
| October 2015 | $306,082.00 |

| | |
|---|---|
| November 2015 | $333,454.00 |
| December 2015 | $465,506.00 |
| January 2016 | $453,454.00 |
| February 2016 | $230,650.00 |
| March 2016 | $420,000.00 |
| April 2016 | $406,605.00 |
| May 2016 | $250,000.00 |
| June 2016 | $342,454.00 |
| July 2016 | $283,052.00 |
| August 2016 | $310,752.00 |
| September 2016 | $371,748.00 |
| October 2016 | $425,000.00 |
| November 2016 | $318,608.00 |
| **Total** | **$6,974,257.00** |

**Answer:** Admitted.

20.    Contrary to the express terms of the Services Agreement, no statement or invoice was delivered to the Debtor in exchange for any of these payments, nor did TAS provide any supporting data in connection with any of the payments it received.

**Answer:** Admitted that no statement or invoice was delivered to the Debtor. Denied that TAS did not provide supporting data in connection with payments it received.

21.    In addition to the above, documents provided by TAS in August of 2016 disclose for the first time that TAS charged the Debtor $289,156.00 for post-petition "referral fees" to Taxi Medallion Management ("TMM"), a related company also indirectly owned and

controlled by Corrigan and Levine. These "referral fees" were purportedly based on an alleged oral agreement and were never approved by the Bankruptcy Court.

**Answer:** Admitted that TMM charged the Debtor and that the Debtor paid referral fees but denied that the fees totaled $289,156. Admitted that TMM is also a subsidiary of Yellow Group LLC. Admitted that no party moved for approval of the oral agreement but denied to the extent the allegation implies that the payment of the fees was not otherwise authorized by the Bankruptcy Code. TAS denies the remaining allegations in paragraph 21.

22.     TAS also appears to have charged the Debtor approximately $31,000.00 for reimbursement of costs TAS incurred in connection with the bankruptcy case without Court approval or notice to creditors.

**Answer**: Admitted that TAS, as part of the Services Agreement, sought reimbursement of approximately $31,000 for reimbursement of the Debtor's discovery costs, a direct expense of the Debtor. TAS denies the remaining allegations in paragraph 22.

23.     According to the sworn deposition testimony of Gary Sakata ("Sakata"), who simultaneously served as the Secretary/Treasurer of the Debtor and the Chief Financial Officer of TAS, TAS was charging the Debtor a weekly fee of approximately $79,812.00 for its services.

**Answer:** Denied.

24.     The Debtor's Summary of Cash Receipts and Disbursements for the month ended September 30, 2016, identifies total outstanding accounts payable as $82,772.00. [*Dkt. No. 1077*]. Mr. Sakata testified at the Meeting of Creditors pursuant to Section 341 of the Bankruptcy Code, that this balance reflected all amount due to TAS under the Services Agreement as of that date.

**Answer**: Admitted that the Summary of Cash Receipts identified the number

$82,772 figure.  TAS denies the remaining allegations in paragraph 24.

25.      According to the Debtor's Summary of Cash Receipts and Disbursements for the month ending October 31, 2016, TAS paid itself $425,000.00 in service fees from the DIP Account. [*Dkt. No*. 1078].

**Answer**:  Admitted that the Debtor paid TAS $425,000 from the DIP Account in October 2016.  TAS denies the remaining allegations in paragraph 25.

26.      According to the Debtor's Summary of Cash Receipts and Disbursements for the sixteen (16) day period ending November 16, 2016, TAS paid itself an additional $318,608.00 in service fees from the DIP Account.  [*Dkt. No*. 1079].

**Answer:**   Admitted that the Debtor paid TAS $318,608 from the DIP Account in November 2016.  TAS denies the remaining allegations in paragraph 26.

## MEMBERSHIP SECURITY DEPOSITS

27.      Effective on November 16, 2016, (the "Conversion Date") the Debtor's bankruptcy case was converted to a case under Chapter 7 of the Bankruptcy Code. [*Dkt. No*. 1048].

**Answer:**  Admitted.

28.      The Trustee was appointed as the Chapter 7 trustee of the Estate on the Conversion Date.

**Answer:**  Admitted.

29.      As of the Conversion Date, the taxi cab affiliation consisted of more than 1,364 member contracts.  Each of the affiliation members entered into a Taxicab Affiliation Agreement ("Affiliation Agreement"), which required affiliation members to pay dues to the Debtor on a weekly basis of approximately $195.00 per week.  In addition, the members were required to post a refundable security deposit with the Debtor.  Members could also request that the Debtor

provide radio and dispatch equipment for which the members assumed responsibility. A sample membership contract is attached hereto as Exhibit B.

**Answer**: Denied that members posted the security deposit with the Debtor. Admitted that the Debtor had approximately 1,364 members as of the conversion date. Otherwise, admitted.

30. According to Schedule B filed by the Debtor [Dkt. No. 213], the Debtor had collected membership deposits totaling $755,264.23 as of the Petition Date ("Security Deposits"). According to the Debtor's schedules, those Security Deposits were in the possession of TAS as of the Petition Date.

**Answer:** Admitted that security deposits totaling $755,264.23 were collected by TAS. TAS denies the remaining allegations in paragraph 30.

31. According to the Debtor's records, TAS was still holding Security Deposits in the amount of $591,923.84 as of the Conversion Date. A listing of the Security Deposits in TAS's possession as of the Conversion Date is attached hereto as **Exhibit C.**

**Answer:** Admitted that $591,923.84 in security deposits remained outstanding at the conversion date. Admitted that Exhibit C reflects a listing of those deposits. TAS denies the remaining allegations in paragraph 30.

32. On November 18, 2016, the Trustee made a demand upon TAS to turnover all Security Deposits to the Estate pursuant to 11 U.S.C §542(a).

**Answer:** Admitted.

33. On November 22, 2016, TAS refused to turnover the Security Deposits to the Trustee.

**Answer:** Admitted that TAS refused to turnover the Security Deposits, which are property of TAS.

## POST-CONVERSION CASH RECEIPTS

34.     On November 16, 2016 and November 17, 2016, after conversion of this case to Chapter 7, TAS collected receipts for membership dues which belong to the Estate.  TAS has failed and refused to turnover those receipts to the Estate.

**Answer**:  Admitted that TAS held receipts to set off or recoup post-petition debt owed by the Estate to TAS.

35.      According to the Final Debtor In Possession Report filed by the Debtor on January 15, 2017 [*Dkt No.* 1080] ("Final DIP Report"), TAS is holding $68,575.00 in funds which it collected after the Conversion Date which belong to the Estate ("Post-Conversion Cash Receipts").

**Answer**:  Admitted that TAS held receipts to set off or recoup post-petition debt owed by the Estate to TAS.

36.     On November 18, 2016, the Trustee made a demand upon TAS to turnover all Post-Conversion Cash Receipts to the Estate pursuant to 11 U.S.C §542(a), and account for all funds received.

**Answer:**  Admitted.

37.     On November 22, 2016, TAS refused to turnover all Post-Conversion Cash Receipts to the Trustee.

**Answer**:  Admitted that TAS held receipts to set off or recoup post-petition debt owed by the Estate to TAS.

### <u>COUNT I</u>
**Turnover and Accounting of Property of the Estate**
**Security Deposits**
**11 U.S.C. § 542(a)**

38.     The Trustee repeats and re-alleges each and every allegation in Paragraphs 1

through 37 of this Adversary Complaint as if fully set forth herein.

**Answer:** TAS incorporates its answers to Paragraphs 1 through 37.

39.    Section 542(a) of the Bankruptcy Code states:

Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. §542(a).

**Answer:** Admitted.

40.    According to Schedule B filed by the Debtor [*Dkt. No*. 213], the Debtor had collected Security Deposits totaling $755,264.23 prior to the Petition Date.

**Answer:**  Admitted that TAS collected $755,264.23 in Security Deposits prior to the Petition Date.  TAS denies the remaining allegations in paragraph 40.

41.    According to the Debtor's records, TAS was still holding Security Deposits in the amount of $591,923.84 as of the Conversion Date. See attached **Exhibit C**.

**Answer:**  Admitted that $591,923.84 in security deposits remained outstanding at the conversion date.  Admitted that Exhibit C reflects a listing of those deposits.  TAS denies the remaining allegations in paragraph 41.

42.    The Security Deposits paid to Debtor are property of the Estate pursuant to Section 541(a) of the Bankruptcy Code.

**Answer:** Denied.

43.    The Security Deposits are property of the Estate which the Trustee may use under the meaning of Section 542(a) of the Bankruptcy Code.

**Answer:** Denied.

44.    The Security Deposits are not of inconsequential value or benefit to the Estate.

**Answer:**  Denied.

45.    TAS is in possession, custody, and control of the Security Deposits.

**Answer:**   Admitted that medallion holders gave the Security Deposits to TAS as contractual responsibilities of TAS.

46.    On November 18, 2016, the Trustee made a demand upon TAS to turnover all Security Deposits to the Estate pursuant to 11 U.S.C §542(a).   See attached **Exhibit F**.

**Answer:**  Admitted.

47.    On November 22, 2016, TAS refused to turnover the Security Deposits to the Trustee.  See attached **Exhibit G**.

**Answer:**  Admitted.

48.    TAS has no legal or contractual basis for refusing to return the Security Deposits to the Estate.

**Answer:**  Denied.

49.    Pursuant to Section 542(a) of the Bankruptcy Code, Defendant is obligated to deliver to the Trustee, and account for, the Security Deposits.

**Answer:**  Denied.

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor of the Trustee:

a.   Ordering TAS to turnover Security Deposits in the amount of at least $591,923.84 for the benefit of the Estate;

b.   Ordering TAS to account to the Trustee for all Security Deposits received or refunded since the Petition Date;

c.   Granting such other relief as this Court deems just and proper.

**Answer:** TAS denies that the Trustee is entitled to any of the above relief.

<u>**COUNT II**</u>
**Turnover and Accounting of Property of the Estate –**
**Post-Conversion Cash Receipts**
**11 U.S.C. § 542(a)**

50.     The Trustee repeats and re-alleges each and every allegation in Paragraphs 1 through 49 of this Adversary Complaint as if fully state herein.

**Answer:** TAS incorporates its answers to Paragraphs 1 through 50.

51.     Section 542(a) of the Bankruptcy Code states:

Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. §542(a).

**Answer:** Admitted.

52.     TAS collected and is currently holding $68,575.00 in Post-Conversion Cash Receipts. [*Dkt No*. 1080].

**Answer:** Admitted.

53.     The Post-Conversion Cash Receipts constitute property of the Estate pursuant to Section 541(a) of the Bankruptcy Code.

**Answer:** Denied.

54.     On November 18, 2016, the Trustee made a demand upon TAS to turnover all Post-Conversion Cash Receipts to the Estate pursuant to 11 U.S.C §542(a), and account for all funds received.

**Answer:** Admitted.

55.     On November 22, 2016, TAS refused to turnover all Post-Conversion Cash

Receipts to the Trustee.

**Answer:** Admitted.

56.    The Post-Conversion Cash Receipts are not of inconsequential value or benefit to the Estate.

**Answer:** Denied.

57.    Defendant has no legal or contractual basis that permits it to hold or setoff against the Post-Conversion Cash Receipts.

**Answer:** Denied.

58.    Pursuant to Section 542(a) of the Bankruptcy Code, Defendant is obligated to deliver to the Trustee, and account for, the Post-Conversion Cash Receipts.

**Answer:** Denied.

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor of the Trustee:

a.  Ordering TAS Defendant to turnover all Post-Conversion Cash Receipts to the Trustee in the minimum amount of $68,575.00;

b.  Ordering TAS to account to the Trustee for all Post-Conversion Cash Receipts;

c.  Granting such other relief as this Court deems just and proper.

**Answer:** Denied that the Trustee is entitled to any of the above relief.

## COUNT III
### Turnover and Accounting of Property of the Estate –
### Overpayment of Service Fees to TAS

59.    The Trustee repeats and re-alleges each and every allegation in Paragraphs 1 through 58 of this Adversary Complaint as if fully state herein.

**Answer:** TAS incorporates its answers to Paragraphs 1 through 58.

60.     On or about January 1, 2010, the Debtor entered into a Services Agreement with TAS, a copy of which is attached hereto as **Exhibit A**.

**Answer:**  Admitted.

61.     Pursuant to the terms of the Services Agreement, TAS provided support services to Debtor including but not limited to: collection of membership dues; cashiering services; dispatch; accounting; back-office functions; maintenance of books and records; IT support and services; assistance in purchasing and supplying radio and communication equipment to Yellow Cab Affiliation Members; assistance securing advertising programs; and assistance with securing insurance.

**Answer:**  Denied that TAS provided any dispatch service other than overflow dispatch service.  Otherwise admitted.

62.     According to the Services Agreement, TAS was entitled to compensation for its services as follows:

(iii)    a base fee of $2,500 per month for services provided hereunder.

(iv)    for each month that the Association has in excess of twenty (20) affiliate members, then with respect to each such affiliate member in excess of twenty (20), an additional fee of $45 per affiliate member per week (based on the average number of affiliate members in the Association for each respective month),
*subject to reconciliation and adjustment within ninety (90) days after the end of each year to reimburse* Service provider for the expenses described in Section 2(b).

**Answer**: Admitted.

63.     Section 2(b) of the Services Agreement provides:

(b)    The Association agrees to pay and reimburse the Service Provider (or its designee) actual and direct out-of-pocket expenses (including fees and disbursements of attorneys, accountants and other professionals retained by the Service Provider in connection with services provided hereunder) incurred by the Service Provider and its personnel in performing services hereunder to the Association and its subsidiaries.   In addition, the Service Provider shall be

16

reimbursed by the Association for all direct costs it incurs on behalf of the Association for any selling, general and administrative costs (including accounting, bookkeeping, executive management, travel, telephone, data processing, and other overhead expenses) reasonably allocated by the Service Provider to services provided or performed on behalf of the Association. ***Any such reimbursement shall be payable by the Association promptly on the Service Provider's rendering of a statement therefor, together with such supporting data as the Association reasonably shall require.***

(Exhibit A at ¶2)(emphasis added).

**Answer:** Admitted.

64.   In April 2015, TAS contends that the Services Agreement was materially modified retroactive to January 1, 2014, to waive the collection and recognition of the base fee and additional fee, and to expand the scope of the expenses for which the Debtor would reimburse TAS.

**Answer:** Admitted.

65.   Contrary to the integration provision in paragraph 5(b) of the Services Agreement, this alleged modification was never reduced to writing nor was it signed on behalf of the Debtor or TAS.

**Answer:** Admitted that a formal, written amendment was not created and signed by the Debtor and TAS. Denied insofar as various written documents describe the modification.

66.   According to the sworn deposition testimony of Gary Sakata, who simultaneously served as the Secretary/Treasurer of the Debtor and the Chief Financial Officer of TAS, TAS was charging the Debtor a weekly fee of approximately $79,812.00 for its services.

**Answer:** Denied.

67.   Contrary to the express terms of the Services Agreement, no statement or invoice was delivered to the Debtor in exchange for any of these payments, nor did TAS provide any

supporting data in connection with any of these payments.

**Answer:**  Admitted that no statement or invoice was delivered to the debtor.  Denied that TAS did not provide supporting data in connection with payments it received.

68.    Instead, TAS would sporadically sweep payments out of the DIP Account as cash was available.  This was done without notice to the Court or other parties in interest.

**Answer:**  Admitted that post-petition TAS deposited receipts for membership dues into the DIP Account.  Admitted that the Debtor paid TAS for TAS's services from the DIP Account and that from time-to-time the DIP Account lacked sufficient funds for TAS to collect payments for its services in a timely fashion.  TAS denies the remaining allegations in Paragraph 68.

69.    In addition to the above, documents provided by TAS in August of 2016 disclose for the first time that TAS charged the Debtor $289,156.00 for post-petition "referral fees" to Taxi Medallion Management ("TMM"), a related company also indirectly owned and controlled by Corrigan and Levine.   These "referral fees" were purportedly based on an alleged oral agreement and were never approved by the Bankruptcy Court.

**Answer:**  Admitted that TMM charged the Debtor and that the Debtor paid referral fees but denied that the fees totaled $289,156.  Admitted that TMM is also a subsidiary of Yellow Group LLC.  Admitted that no party moved for approval of the oral agreement but denied to the extent the allegation implies that the payment of the fees was not otherwise authorized by the Bankruptcy Code.  TAS denies the remaining allegations in paragraph 69.

70.    TAS also appears to have charged the Debtor approximately $31,000.00 for reimbursement of costs TAS incurred in connection with the bankruptcy case without Court approval or notice to creditors.

**Answer**:  Admitted that TAS, as part of the Services Agreement, sought reimbursement of approximately $31,000 for reimbursement of the Debtor's discovery costs, a direct expense

of the Debtor.  TAS denies the remaining allegations in paragraph 70.

71.     The Debtor's Summary of Cash Receipts and Disbursements for the month ended September 30, 2016, identifies total outstanding accounts payable as $82,772.00.  [*Dkt No.* 1077]. This Summary of Cash Receipts and Disbursements is attached hereto as **Exhibit D**. Mr. Sakata testified at the Meeting of Creditors pursuant to Section 341 of the Bankruptcy Code that this balance reflected all amounts due to TAS under the Services Agreement as of that date.

**Answer**:  Admitted that the Summary of Cash Receipts and Disbursements for the month ended September 30, 2016 reflects total outstanding accounts payable as $82,772.  TAS denies the remaining allegations in paragraph 71.

72.     According to the Debtor's Summary of Cash Receipts and Disbursements for the month ended October 31, 2016, TAS paid itself $425,000.00 in service fees from the DIP Account. [*Dkt No.* 1078].

**Answer**:  Admitted that the Debtor paid TAS $425,000 from the DIP Account in October 2016. TAS denies the remaining allegations in paragraph 72.

73.     According to the Debtor's Summary of Cash Receipts and Disbursements for the sixteen (16) day period ended November 16, 2016, TAS paid itself an additional $318,608.00 in service fees from the DIP Account.  [*Dkt No.* 1079].

Based on the information provided by the Debtor, TAS has been overpaid for its service fees for the months of October 2016 and November 2016 calculated as follows:

| | |
|---|---|
| Accounts Payable as of September 30, 2016 | $82,772.00 |
| TAS Service Fees October 2016 and November 2016 | $558,684.00 [2] |
| TAS Payments October 2016 | ($425,000.00) |

_____

[2] Calculated based on a weekly fee of $79,812.00 for the seven (7) week period between October 1, 2016 and November 16, 2016.

TAS Service Fees thru November 16, 2016                 ($318,608.00)

Overpayment                                             $102,152.00

**Answer:**   Admitted that the Debtor paid TAS $318,608 from the DIP Account in November 2016.   TAS denies the remaining allegations in paragraph 73, including the calculation in the footnote.

74.     TAS overpaid itself for its service fees of at least $102,152.00 for the months of October 2016 and November 2016.

**Answer:** Denied.

75.     In addition, the payment of referral fees to TAS in the amount of $289,156.00 and reimbursement of bankruptcy costs in the amount of $31,000.00 were never approved by the Bankruptcy Court.

**Answer:**   Admitted that no party moved for approval of the fees but denied to the extent the allegation implies that the payment of the fees was not otherwise authorized by the Bankruptcy Code.   TAS denies the remaining allegations in paragraph 75.

76.     Based on the above, TAS has been overpaid for its alleged post-petition services by at least $422,308.00.

**Answer:** Denied.

77.     These overpayments to TAS constitute property of the Estate.

**Answer:** Denied.

78.     The overpayment to TAS is not of inconsequential value or benefit to the Estate.

**Answer:** Denied

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor of the Trustee and against TAS:

a.   Ordering TAS to turnover to the Trustee the overpayments of service fees

20

in the amount of $422,308.00; and

    b.    Granting such other relief as this Court deems just and proper.

**Answer:** TAS denies that the Trustee is entitled to any of the above relief.

<u>**COUNT IV**</u>
**Claim For Accounting**
**Service Fees Paid To TAS During Chapter 11 Proceeding**

79.    The Trustee repeats and re-alleges each and every allegation in Paragraphs 1 through 78 of this Adversary Complaint as if fully state herein.

**Answer:** TAS incorporates its answers to paragraphs 1-78.

80.    TAS was an insider that controlled virtually every aspect of the Debtor's operations.

**Answer:** Denied.

81.    Throughout the course of the Chapter 11 proceeding, TAS paid itself a total of $6,974,257.00 in service fees from the DIP Account.

**Answer:** Admitted that the Debtor paid TAS $6,974,257 from the DIP Account during the Chapter 11 proceeding.

82.    In order to pay itself, TAS sporadically swept payments out of the DIP Account as cash was available. This was done without notice to the Court or other parties in interest.

**Answer:** Admitted that the Debtor paid TAS for TAS's services from the DIP Account and that from time-to-time the DIP Account lacked sufficient funds for TAS to collect payments for its services in a timely fashion. TAS denies the remaining allegations in Paragraph 82.

83.    TAS also appears to have unilaterally expanded the scope of costs and expenses for which it sought to be compensated for under the Services Agreement. The Debtor's records indicate that TAS was allocating all of its operating expenses among the Debtor and the other

affiliations being managed by TAS.

**Answer:** Denied.

84. In addition to the above, TAS was charging the Debtor for "referral fees" to TMM and for reimbursement of bankruptcy expenses incurred by TAS.

**Answer:** Admitted that TAS sought reimbursement from the Debtor for the Debtor's discovery-related expenses pursuant to the Services Agreement. Admitted that TMM charged the Debtor referral fees. TAS denies the remaining allegations of paragraph 84.

85. While TAS swept all available cash out of the DIP Account, there is no indication that TAS made any provision for other Debts being incurred by the Debtor, including but not limited to trade debt, professional fees or the fees and costs being incurred by the Official Committee of Unsecured Creditors, nor was the Debtor left with any operating profit.

**Answer:** Denied.

86. Contrary to the express terms of the Services Agreement, no statement or invoice was delivered to the Debtor in exchange for any of these payments, nor did TAS provide any supporting data in connection with any of these payments when they were made.

**Answer:** Admitted that no statement or invoice was delivered to the debtor. Denied that TAS did not provide supporting data in connection with payments it received.

87. As of the Conversion date, the Debtor was left with little or no cash in the estate, and unpaid Chapter 11 administrative claims in excess of $1,500,000.00. As a result the Estate was administratively insolvent.

**Answer:** Admitted that as of the Conversion date, there was little cash in the estate. Admitted that interim fee awards for professionals in the Chapter 11 case exceeded $1,500,000. TAS denies the remaining allegations in paragraph 87.

88. Based on the above, the Trustee seeks an accounting of all fees paid to TAS for

the duration of Debtor's Chapter 11 bankruptcy to determine: (1) if TAS has been paid service

fees in excess of what it was entitled and (2) if any excess funds paid to TAS constitute property

of the Estate.

**Answer:** Denied that the Trustee is entitled to the relief in paragraph 88.

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor of

the Trustee:

a.    Order Defendant to provide an accounting of all payments received by Defendant

during the pendency of Debtor's Chapter 11 bankruptcy;

b.    Grant Such other Relief as the Bankruptcy Court deems just and proper.

**Answer:**  TAS denies that the Trustee is entitled to any of the above relief.

**COUNT V**
**Disgorgement of Payments**
**11 U.S.C. §726(b)**

89.    The Trustee repeats and re-alleges each and every allegation in Paragraphs 1

through 88 of this Adversary Complaint as if fully set forth herein.

**Answer**:  TAS incorporates its responses to paragraphs 1-88.

90.    Section 726(b) of the Bankruptcy Code provides:

(b)    Payment on claims of a kind specified in paragraph (1), (2), (3), (4), (5), (6),
(7), (8), (9), or (10) of section 507(a) of this title, or in paragraph (2), (3), (4), or (5) of
subsection (a) of this section, shall be made pro rata among claims of the kind specified in
each such particular paragraph, except that in a case that has been converted to this chapter
under section 1112, 1208, or 1307 of this title, a claim allowed under section 503(b) of this
title incurred under this chapter after such conversation has priority over a claim allowed
under section 503(b) of this title incurred under any other chapter of this title or under
this chapter before such conversion and over any expenses of a custodian superseded under
section 543 of this title.

11 U.S.C. §726(b).

**Answer:**  Admitted.

91.    In the event there is insufficient money in the Estate to pay every claim in full,

Section 726(b) requires creditors of the same priority class be paid pro-rata.

**Answer:** Paragraph 91 calls for a legal conclusion.  To the extent a response is required, TAS admits that in some circumstances Section 726(b) can require pro-rata distribution to creditors of equal priority but denies that Section 726(b) requires that result here.

92.     To the extent Chapter 11 administrative expenses are paid on an interim basis and it is ultimately determined that there will be insufficient funds to similarly pay all other Chapter 11 administrative claims, those who have received interim payments are required to disgorge funds so that all other administrative claims share pro rata.

**Answer:** Paragraph 92 calls for a legal conclusion.  To the extent a response is required, TAS admits that a court may, in some circumstances, require the return of interim fee awards but denies that the expenses paid to TAS were interim and denies that return of the expenses is appropriate here.

93.     Throughout the course of the Chapter 11 proceeding, TAS paid itself a total of $6,974,257.00 in service fees from the DIP Account.

**Answer:** Admitted that the Debtor paid TAS $6,974,257 from the DIP Account during the Chapter 11 proceeding.

94.     In order to pay itself, TAS sporadically swept payments out of the DIP Account as cash was available.  This was done without notice to the Court or other parties in interest.

**Answer:** Admitted that the Debtor paid TAS for TAS's services from the DIP Account and that from time-to-time the DIP Account lacked sufficient funds for TAS to collect payments for its services in a timely fashion.  TAS denies the remaining allegations in Paragraph 94.

95.     While TAS  sporadically swept all available cash out of the DIP Account, there is no indication that TAS made any provision for other Debts being incurred by this Debtor, including but not limited to trade debt, professional fees or the fees and costs being incurred by

the Official Committee of Unsecured Creditors, nor was the Debtor left with any operating profits.

**Answer:** Denied.

96.    Contrary to the express terms of the Services Agreement, no statement or invoice was delivered to the Debtor in exchange for any of these payments, nor did TAS provide any supporting data in connection with any of these payments when they were made.

**Answer:** Admitted that no statement or invoice was delivered to the debtor. Denied that TAS did not provide supporting data in connection with payments it received.

97.    During the course of the Chapter 11 case, TAS had complete control over the cash flow of the Debtor, assuring itself of the payment of its own service fees, to the detriment of other administrative creditors.

**Answer:** Admitted that TAS provided back-office support to the Debtor, including collection of cash receipts and payment of expenses. TAS denies the remaining allegations of paragraph 97.

98.    As of the Conversion date, the Debtor was left with little or no cash in the Estate, and unpaid Chapter 11 administrative claims in excess of $1,500,000.00.

**Answer:** Admitted that as of the Conversion date, there was little cash in the estate. Admitted that interim fee awards for professionals in the Chapter 11 case exceeded $1,500,000. TAS denies the remaining allegations in paragraph 98.

99.    As a result the Debtor's Chapter 11 estate is administratively insolvent.

**Answer:** Denied.

100.    TAS was an insider that controlled virtually every aspect of the Debtor's operations.

**Answer:** Denied.

101.    The payments made to TAS during the Chapter 11 case in the amount of $6,974,257.00 were not made in the ordinary course of business or pursuant to ordinary business terms.

**Answer:** Denied.

102.    Based on the above, the service fees paid to TAS during the Chapter 11 proceeding are subject to disgorgement pursuant to 11 U.S.C. §726(b).

**Answer:** Denied.

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor of the Trustee and against TAS:

     a.    Ordering TAS to disgorge payments received from the Debtor  in the amount of at least $1,500,000.00, or such other amount sufficient to assure pro rata distribution to other Chapter 11 administrative claimants as required by 11 U.S.C. §726(b); and

     b.    Such other relief as the Bankruptcy Court deems just and proper.

**Answer:** TAS denies that the Trustee is entitled to any of the above relief.

### COUNT VI
### (Alternative Count)
### Avoidance of Post-Petition Payments
### 11 U.S.C. §549(a)(2)(B)

103.    The Trustee repeats and re-alleges each and every allegation in Paragraphs 1 through 102 of this Adversary Complaint as if fully set forth herein.

**Answer:** TAS incorporates its responses to paragraphs 1-102.

104.    Section §549(a) of the Bankruptcy Code allows a Trustee to avoid post-petition payments and provides as follows:

  (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate (1) that occurs after the commencement of the case

26

and…(B) that is not authorized under this title or by the court.

11 U.S.C. §549(a)(2)(B).

**Answer:**  Admitted.

105.     Section 363(c)(1) of the Bankruptcy Code states, "[i]f the business of the debtor is

authorized to be operated….and unless the court orders otherwise the [debtor in possession] may

enter into transactions…in the ordinary course of business…without notice or a hearing."  11

U.S.C. §363(c)(1).

**Answer:**  Admitted.

106.     Transactions which do not occur in the ordinary course of business can only be

paid after notice and a hearing and with approval of the Bankruptcy Court.

**Answer**:  Paragraph 106 states a legal conclusion.  To the extent a response is required,

TAS admits that transactions outside the ordinary course of business ordinarily require approval

of the Bankruptcy Court, subject to exceptions.

107.     Throughout the course of the Chapter 11 proceeding, TAS paid itself a total of

$6,974,257.00 in service fees from the DIP Account.  A summary of all payments made to TAS

during the pendency of Debtor's Chapter 11 bankruptcy is attached hereto as **Exhibit E**,

("Transfers").

**Answer:**  Denied.

108.     During the course of the Chapter 11 case, TAS had complete control over the

cash flow of the Debtor, assuring itself of the payment of its own service fees, to the detriment of

other administrative creditors.

**Answer:**   Admitted that TAS provided back-office support to the Debtor, including

collection of cash receipts and payment of expenses.  TAS denies the remaining allegations of

paragraph 108.

109.    In order to pay itself, TAS sporadically swept payments out of the DIP Account as cash was available.

**Answer**:  Admitted that the Debtor paid TAS for TAS's services from the DIP Account and that from time-to-time the DIP Account lacked sufficient funds for TAS to collect payments for its services in a timely fashion.  TAS denies the remaining allegations in Paragraph 109.

110.    While TAS sporadically swept all available cash out of the DIP Account, there is no indication that TAS made any provision for other Debts being incurred by this Debtor, including but not limited to trade debt, professional fees or the fees and costs being incurred by the Official Committee of Unsecured Creditors, nor was the Debtor left with any operating profits.

**Answer:**  Admitted that the Debtor paid TAS for TAS's services from the DIP Account and that from time-to-time the DIP Account lacked sufficient funds for TAS to collect payments for its services in a timely fashion.  TAS denies the remaining allegations in Paragraph 110.

111.    Contrary to the express terms of the Services Agreement, no statement or invoice was delivered to the Debtor in exchange for any of these Transfers, nor did TAS provide any supporting data in connection with any of these Transfers when they were made.

**Answer:**  Admitted that no statement or invoice was delivered to the debtor.  Denied that TAS did not provide supporting data in connection with payments it received.

112.    TAS had complete control over the Debtor's operations as well as the cash flow of the Debtor.

**Answer:**  Denied.

113.    TAS was an insider as defined by the bankruptcy code.

**Answer:**  Admitted.

114.    The post-petition Transfers to TAS in the amount of $6,974,257.00 did not take

place in the ordinary course of business, or pursuant to ordinary business terms, and therefore notice and a hearing would have been required in order for each of these Transfers to have been allowed under 11 U.S.C. §503(b).

**Answer:**  Denied.

115.   The payments to TAS were made to insiders without notice to the Court or other parties in interest, and were not authorized.

**Answer:**  Admitted that no party moved for approval of the fees but denied to the extent the allegation implies that the payment of the fees was not otherwise authorized by the Bankruptcy Code.

116.   Based on the above, each of the Transfers identified in Exhibit E should be avoided pursuant to 11 U.S.C. §549(a)(2)(B) of the Bankruptcy Code.

**Answer:**  Denied.

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor of the Trustee:

a.   Determining all Transfers made to TAS took place outside of the ordinary course of business; and

b.   Entering judgment in favor of the Trustee and against TAS in the amount of $6,974,257.00; and

c.   Granting such other relief as this Court deems just and proper.

**Answer:**  TAS denies that the Trustee is entitled to the above relief.

### COUNT VII
### (Alternative Count)
### Recovery of Post-Petition Transfer
### 11 U.S.C. §550(a)

117.   The Trustee repeats and re-alleges each and every allegation in paragraphs 1

through 116 of this Adversary Complaint as if fully set forth herein.

**Answer:** TAS incorporates its responses to paragraphs 1-116.

118.    The Defendant was the initial transferee of the Transfers and/or the entity for whose benefit the Transfers were made.

 **Answer:** Admitted.

119.    The Trustee is entitled to recover the value of the Transfers, plus applicable interest, pursuant to 11 U.S.C. §550(a)(1).

**Answer:** Denied.

WHEREFORE, the Trustee requests the Bankruptcy Court enters judgment in favor of the Trustee:

    a.    Determining the Trustee is able to recover all Transfers under 11 U.S.C. §550(a);

    b.    Authorizing the Trustee to recover the full value of all Transfers from Defendant pursuant to 11 U.S.C. §550(a);

    c.    Award the Trustee costs and reasonable attorneys' fees to the extent permitted by law, through trial and any subsequent appeals;

    d.    Award the Trustee post-judgment interest pursuant to 28 U.S.C. §1961 until the entire amount of all Transfers are paid; and

    e.    Such relief as the Bankruptcy Court deems just and proper.

 **Answer:** TAS denies that the Trustee is entitled to the above relief.

## COUNT VIII
### Equitable Subordination
### 11 U.S.C. §510(C)

120.    The Trustee repeats and re-alleges each and every allegation in Paragraphs 1

through 119 of this Adversary Complaint as if fully set forth herein.

**Answer:** TAS incorporates its answers to paragraphs 1-119.

121.    Section 510(C) of the Bankruptcy Code states, "…after notice and a hearing, the court may under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."

**Answer:** Admitted.

122.    A debtor corporation's officers, directors and persons in control of the debtor are "insiders" of the debtor as defined in 11 U.S.C. §101(31).

**Answer:** Admitted.

123.    The Debtor and TAS were managed by the same officers, controlled by the same individuals, shared the same office space, and used the same employees.

**Answer:** Admitted that the Debtor and TAS had some overlapping officers and shared the same office space.  Denied that the Debtor and TAS shared all of the same officers or employees or that the Debtor and TAS were controlled by the same individuals.

124.    TAS had complete control over the Debtor's operations as well as the cash flow of the Debtor.

**Answer:**  Admitted that TAS provided back-office support to the Debtor, including collection of cash receipts and payment of expenses.  TAS denies the remaining allegations of paragraph 124.

125.    TAS was an insider as defined by the bankruptcy code.

**Answer:** Admitted.

126.    The Debtor was a mere instrumentality of TAS and other creditors have been prejudiced by the transactions between TAS and the Debtor.

**Answer:** Denied.

127.    The payments made by the Debtor to TAS failed to comport with the duties of a Debtor in Possession under the Bankruptcy Code and were detrimental to the Estate.

**Answer:** TAS is without knowledge sufficient to admit or deny the duties of a Debtor in Possession.  TAS denies that the payments were detrimental to the Estate.

WHEREFORE, the Trustee requests that the Bankruptcy Court enter judgment in favor of the Trustee:

    a.    Determining that should TAS be allowed any administrative claim for services performed for the Debtor, such claims should be equitably subordinated to the claims of other creditors in this case pursuant to 11 U.S.C. §510(c); and

    b.    Such other relief as the Bankruptcy Court deems just and proper.

**Answer:** TAS denies that the Trustee is entitled to any of the above relief.

## **Affirmative and other Defenses**

### **Payments to TAS Were Made in the Ordinary Course (§ 363)**

1.    The Trustee's claims are barred, in whole or in part, because payments to TAS were made in the ordinary course of the Debtor's business during bankruptcy.

2.    Section 363(c) of the Bankruptcy Code provides that:

If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing

3.    The business of the Debtor was authorized to operate in the Chapter 11 proceeding.

4.    TAS performed the same services for the Debtor during the bankruptcy as it had

32

pre-petition.

5.      TAS received payments of a similar magnitude during the bankruptcy as it did

pre-petition.

6.      The transactions with TAS did not subject creditors to economic risks different

from those contemplated in view of the Debtor's pre-petition practices.

7.      The transactions with TAS were undertaken in the ordinary course of the Debtor's

business.

8.      Accordingly, the payments to TAS were administrative expenses, which are not

subject to disgorgement or avoidance.

**TAS Was a Good-Faith Transferee (§ 550(b))**

9.      Section 550(b) of the Bankruptcy Code provides that "a trustee may not recover

under section (a)(2) of this section from—(1) a transferee that takes for value, including

satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of

the voidability of the transfer avoided . . . ."

10.     The Trustee's claims are barred in whole or in part, because TAS was a good-faith

recipient of the Debtor's funds.

11.     TAS received payments from the Debtor in exchange for services, without

knowledge of any alleged voidability and in good faith.

12.     TAS provided value in the form of essential services to the Debtor in exchange for

the payments.

13.     In particular, TAS performed under the Services Agreement at a cost-only price,

providing valuable services to the Debtor throughout the Chapter 11 Bankruptcy.

**Setoff or Recoupment**

14.     The Trustee's claims are barred, in whole or in part, by the doctrines of setoff or

recoupment.

15.    As of November 16, 2017, the Debtor owed TAS a balance of at least $82,124.92.

16.    The balance was incurred post-petition.

17.    The at least $82,124.92 represents either a mutual debt or a debt that arose out of the same transaction with the Debtor

18.    TAS is entitled to setoff or recoup the money it is owed against the Trustee's claims.

**The Trustee's Claims Are Barred By Estoppel**

19.    The Trustee's claims are barred, in whole or in part, by the doctrine of estoppel.

20.    The Trustee is the successor-in-interest to the Debtor-in-Possession and represents the interests of creditors.

21.    During the Chapter 11 case, both the Debtor-in-Possession and creditors took the position that the Debtor ought to continue operating under the Services Agreement with TAS. *See, e..g.*, Dkt. 618 at 21:15-20 ("The headline is that all we're asking is that the TAS agreement be honored and lived up to.  It's a fundamental – it's a fundamental document that governs the debtor's operations.").

22.    The Debtor-in-Possession did not assume or reject the Services Agreement, and the Committee of Unsecured Creditors took the position that the Services Agreement was an executory contract, which TAS was bound to perform until rejection.

23.    The Debtor-in-Possession treated payments to TAS as ordinary course payments that were final and not subject to recovery.

24.    In reliance on those positions, TAS continued to perform under the Services Agreement.

25.    The Debtor-in-Possession and creditors received a benefit—TAS's continued

performance at cost.

26.     The Trustee's alteration of the position of the Debtor-in-Possession and creditors causes a detriment to TAS.

27.     Accordingly, the Trustee is estopped from asserting that payments to TAS are outside the ordinary course or otherwise not authorized by the Bankruptcy Code.

### Law of the Case

28.     The Trustee's claims are barred, in whole or in part, by law of the case.

29.     In deciding various motions during the Chapter 11 proceeding, the court made factual determinations concerning the nature of the payments made by the Debtor to TAS.

30.     The court found, for example, that the oral modification of the Services Agreement was to the "benefit of the debtor and all the creditors."  Dkt. 972 at 23:25.

31.     As a further illustrative example, the court also found that the fact that the modification of the Services Agreement was oral "seems to have little practical effect."

32.     These and other factual determinations negate, in whole or in part, the possibility of any finding that the payments to TAS were not made in the ordinary course of business or otherwise not authorized by the Bankruptcy Code.

Dated:    August 17, 2017
           Chicago, Illinois

Respectfully Submitted,

/s/Justin B. Weiner
Justin B. Weiner
MOLOLAMKEN LLP
300 N. LaSalle Street
Chicago, IL 60654
(312) 450-6700

*Counsel for Taxi Affiliation Services, LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Answer was served upon all counsel:

Michael K. Desmond
Figliulo & Silverman P C
10 South LaSalle Street Ste 3600
Chicago, IL 60603

Lindsey L Purdy
Figliulo Silverman, P.C.
10 S. LaSalle Street
Chicago, IL 60603

via the Court's CM/ECF System on August 17, 2017.

/s/ Justin B. Weiner
Justin B. Weiner